**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| _____ ) | |
| BUCKHEAD CITY COMMITTEE,            ) | |
|                                    ) | |
|      Plaintiff,                        ) | |
|                                    ) | CIVIL ACTION |
| v.                                 ) | |
|                                    ) | NO. _____ |
| CITY OF ATLANTA, GEORGIA,          ) | |
| and its MAYOR ANDRE DICKENS,       ) | |
|                                    ) | |
|      Defendants.                       ) | |
| _____) | |

## COMPLAINT

Plaintiff Buckhead City Committee brings this Complaint to protect its rights and those of others against the actions being taken by the Defendant City of Atlanta, Georgia and its leaders to squelch constitutionally-protected freedoms.

## NATURE OF THE CASE

1.

This civil action seeks injunctive relief and monetary damages. First and foremost, the Court will be asked to protect the time-sensitive activities of the Buckhead City Committee. By its very nature, the Buckhead City Committee

works within the boundaries of the City of Atlanta.  This gives the City power to disrupt the Committee's work, power which it has improperly exercised.

2.

The Buckhead City Committee ("Committee") is a 501(c)(4) non-profit organization with a goal of gaining a separately incorporated City of Buckhead, Georgia.  Such a City of Buckhead will be created if the Georgia General Assembly approves legislation to place the issue on the November 2022 ballot and the citizens of Buckhead vote to approve the new city.

3.

The Committee has led the fight to create the City of Buckhead since its formation.  The Committee is supported by many thousands of members of the Buckhead community.  Such persons are deeply concerned about problems that have arisen under the government of the City of Atlanta.  Such concerns include rampant crime, Atlanta courts that release repeat criminal offenders without concern for law-abiding citizens, roads littered with potholes, broken sidewalks, poor services such as garbage collection, high taxes, and political corruption.

4.

The City of Buckhead will be created from areas currently located in the City of Atlanta.  The current leaders of the City of Atlanta have made it clear that they do not want the City of Buckhead to be approved.  Newly-elected Mayor Andre Dickens is one such leader.

5.

Due to the anger and animosity of the leaders of the City of Atlanta toward the Committee and its purposes, Atlanta officials have taken improper actions in an attempt to harm the Committee and stifle its message and activities.

6.

Such actions include refusal to issue sign permits, the issuance of citations or threats of citations pertaining to the legitimate use of signs for free speech activities, and threats of citations based on parking at the Committee's offices in the heart of Buckhead.

7.

The Committee cannot risk improper enforcement actions by the City which could derail its time-critical efforts to gain approval of the City of Buckhead.

8.

This case is filed to protect the fundamental rights of the Committee and its supporters, including the rights of free speech, free assembly, due process, and equal protection.

## PARTIES

9.

The Committee was registered in the year 2020 as a non-profit 501(c)(4) organization.  Such social welfare organizations are limited in their activities and are tax exempt.  The Committee offers the following description of itself on its website:

> *The Buckhead City Committee (BCC), formerly known as the Buckhead Exploratory Committee, is a nonpartisan organization comprised of a group of diverse residents and business owners in the Buckhead neighborhood of Atlanta who want the best for our community.*
> *The City of Atlanta has displayed a pattern of neglect and disrespect towards our community which has caused crime to increase at an alarming rate, our infrastructure to crumble, and many residents to flee the area.*
> *We want a Buckhead where its citizens:*
> - *Are protected by a police force that is respected, properly staffed, appropriately trained, and fully funded*
> - *Have emergency response times that are as fast as possible*
> - *Receive city services commensurate with taxes paid*
> - *Benefit from a well-maintained infrastructure*

- *Communicate more directly with municipal leadership*
- *Control issues affecting zoning, parks and recreation*
- *Engage actively in neighborhood improvement endeavors*

10.

The City of Atlanta is a political subdivision of the State of Georgia. Service of the City may be perfected via service on the Mayor Andre Dickens at 55 Trinity Avenue, SW, Suite 2500, Atlanta, Georgia 30303.  The Mayor is the elected head of the City of Atlanta government.  He is the chief executive of the City and has the authority to direct staff to cease and desist the unconstitutional conduct described herein.

**JURISDICTION AND VENUE**

11.

This case raises constitutional claims under the United States Constitution and the First, Fifth, and Fourteenth Amendments thereto.  Pursuant to 42 U.S.C. § 1983, violations of fundamental rights are actionable and compensable.  Such claims are based on federal law and may proceed in federal court.  The Georgia Constitution also protects these liberties, in some cases even more stridently than the United States Constitution.  Such state constitutional claims are, however,

appropriately raised in federal court as part of the Court's supplemental or pendent jurisdiction.

12.

The City of Atlanta is located in Fulton and DeKalb Counties, each of which are included in this District.  The proposed City of Buckhead is entirely located within this District.  The Northern District is the appropriate venue.

## FACTUAL ALLEGATIONS

A.   <u>The Committee Opens Offices in Buckhead.</u>

13.

In order to have a physical office for its staff and volunteers, in 2021, the Committee opened an office at 3002 Peachtree Road.  This a very prominent location in the heart of the Buckhead community.

14.

The Committee office is located in an existing building that has been utilized for a variety of businesses for 40 years.  For example, the site housed the Three Dollar Café bar and restaurant for many years.  Prior to the Committee's occupancy, the most recent business in the space was Saville Studios, an art studio.

15.

The site already had several signs in place. The Committee hired an experienced sign company to change the text or copy on the signs to the Committee's messages.

16.

The Committee hired an experienced sign vendor and design firm to prepare and install signs for the Committee.

17.

The sign vendor immediately surveyed the site and determined that no new signs were needed but that the copy needed to be changed on three signs, namely the existing roof sign, the existing wall sign, and the existing freestanding sign.

18.

The sign vendor researched the City of Atlanta's sign ordinance and permitting portions of the City website and determined that the new messages could be posted on the existing signs. The Atlanta City Code provides as follows:

> *Messages: Any sign allowed herein may contain any lawful message so long as said sign complies with the size, height, area and other requirements of this chapter and of part 16 of the code of ordinances.*

<u>See</u> Sign Ordinance, § 16-28A.007(g).  Thus, changing the messages on the signs was specifically allowed under the City Code.

19.

Even if the existing signs at the Committee headquarters were nonconforming under the current City Code, the changing of the content on the signs would still be allowed:

> *Nonconforming Sign Regulations: . . . (3) Change of copy or message or the substitution of panels or faces on nonconforming signs and repainting, refacing or repostering nonconforming sign shall be permitted to the extent authorized by section 16-28A.013 and chapter 24 of part 16. Repairs and normal maintenance of nonconforming signs, such as repainting, electrical repairs, and neon tubing repairs, shall be permitted, to the extent authorized by this chapter 28A, and chapter 24 of part 16, provided it does not enlarge or expand the degree of nonconformity.*

<u>See</u> Sign Ordinance, § 16-28A.014(b)(3).  Therefore, under any circumstances, the City of Atlanta Code specifically allowed the Committee to post its desired messages on the existing signs.

20.

The only time the City of Atlanta requires permits to change the copy area of a sign is related to billboards:

*A sign permit shall be required for a change of materials or for the substitution of panels or faces on a billboard sign to verify that the sign is structurally sound, is at a location, and is of a size and height, which meets the requirements for a lawful sign under this part.*

See Sign Ordinance, § 16-28A.013(a)(iii).   The signs at the Committee headquarters are not billboards, but rather are on-premise signs for use by the on-site organization.  Thus, no permits were needed.

21.

Even if the signs at issue had not already been in place, they would have been allowed in the applicable zoning district, which is the SPI-9 Buckhead Village District.  The City Code provides:

*(19) SPI-9 Buckhead Village District: Signs shall be permitted in the SPI-9 District as follows: . . . (c) Type, Number, and Area of Business Identification Signs: (i) Type: Wall signs, projecting signs, canopy signs, parapet wall signs, monument signs, freestanding signs, suspended signs, and marquee signs shall be permitted. Building signature signs shall be permitted, subject to the restrictions set forth in section 16-28A.007(p) and section 16-28A.010(19)(a). (ii) Number: (A) Three signs shall be allowed on the premises of active sidewalk level uses having a frontage along a public street or a private street where visible from a public street. One sign may be suspended from the wall or project over any frontage if approved in the manner required for its placement unless such signs are restricted by specific sub-area regulations. (B) Two signs shall be allowed on the premises of businesses located on a building floor above sidewalk-level and having a frontage along a public street or a private street where visible from a public street. One sign may be suspended from the wall or project over any frontage if approved in the manner required for its*

9

*placement. (C) For businesses or having frontage on more than one public street or private street, one additional sign for the business establishment shall be permitted on the premises of such business, provided that no sidewalk level frontage contains more than three signs and no frontage above sidewalk level contains more than two signs. The total area of increase for any additional sign allowed by this subsection shall not cause all signs on a frontage to exceed ten percent of the area of the wall area of said building occupied by such business establishment on that frontage or 60 square feet, whichever is less. (iii) Area: The combined area of permitted signs shall not exceed ten percent of the total aggregate area of the walls that face the public right-of-way or which face a private drive and are visible from a public right-of-way provided however that at least 60 square feet of combined sign area is allowed. No individual sign shall exceed 200 square feet. (d) Maximum Height of Signs: Section 16-28A.007(m) shall be supplanted for SPI-9 by the following height limitations provided however that no portion of any sign shall extend above the top of the building upon which it is located where the building height is less than the height permitted for signs. (i) Where a business establishment is permitted to have signs, the following regulations shall apply: (ii) Sidewalk-level business establishments: For such establishments signs are permitted to a maximum height of 35 feet above the adjacent sidewalk-level.*

<u>See</u> Sign Ordinance, § 16-28A.010(19).  Therefore, each of the signs sought by the

Committee would have been allowed even as a new sign under the terms of the

City Code.

B.     The Committee Seeks Permits for the Signs at its Offices.

22.

Despite the clear text of the City Code allowing the message changes without a permit, in an abundance of caution, the Committee's sign vendor submitted sign permit applications to the City of Atlanta.  Such permits were not needed pursuant to the City Code but it certainly would not hurt to seek City permits.

23.

On October 13, 2021, the vendor submitted sign applications on behalf of the Committee.  Three applications were submitted: one to change the message on the existing roof sign, one to change the message on the existing wall sign, and one to change the message on the existing freestanding sign.  Each application prominently showed that the sign would promote the Committee and its goal of forming Buckhead City.  It would have been clear to any person reviewing the applications that they were for the Buckhead City Committee.

24.

On October 18, 2021, the Committee's sign vendor was contacted by the City requesting payment for each of the permit applications. The City staff member stated that the applications would be considered after payment was submitted. The vendor made the payments and continued to monitor the permit process via the City's online permitting system. The permitting system stated that the deadline for zoning department review of the applications was October 25, 2021.

25.

No permits were received by October 25, 2021. On October 26, 2021, the vendor contacted the City and requested an update on the permits. The vendor was told that the applications had just been sent to an inspector and that the inspector had 30 days from October 26, 2021 to review the applications. Obviously such a long delay before posting the Committee's time-sensitive messages was not acceptable or appropriate.

26.

On October 27, 2021, the Committee's vendor sent the following email to the inspector who had been assigned the applications for review:

*Good Morning Maria,*

*I am wondering if there is any way that this can happen sooner than 30 days? When I was downtown and told that the office was closed to walkins and to apply online, they estimated a total of 10 days for general sign permits.*

*Is there any possible way to expedite this request since the sign structure already exists on the building, we are only asking to replace the sign graphics/messaging?*

*Thank you for your help with this.*

27.

Rather than proceeding to issue the sign permits, the City staffer began a series of delaying tactics. For example, as to the existing roof sign, the staffer requested proof that the sign had been issued a lawful permit. The sign was over 30 years old and the Committee's newly-hired vendor had no access to its permitting history. The vendor explained to the City that none of the decades-old permit records were available. The City merely raised other pretexts to delay and reject the requested permits.

28.

After weeks of back-and-forth, the City still had not issued the permits.  This

violated the City of Atlanta's own 30-day limit for sign application processing.  In

accordance with the City Code, on the 31st day after the applications had been

submitted, the Committee was allowed to post the requested signs:

> *All applications for sign permits shall be either issued or denied within thirty (30) days of their submission.  If the sign permit is neither issued nor denied within this time period, the applicant may at their own risk erect a sign meeting the requirements of this part as if the application had been granted.*

See Sign Ordinance, § 16-28A.013(b)(2).  This provision was added to the City

Code – and many sign codes – because courts have repeatedly held that, if a

government official can "pocket veto" a sign application, free speech rights will be

at risk.  Thus, time limits on sign permitting must be in place.  In most instances,

such code provisions state that an unduly delayed sign application shall be deemed

granted.  Therefore, the speech activity can move forward.  The City of Atlanta has

taken a different tack by allowing sign applicants to post their sign, but only at

their own risk.  Despite such a risk, the Committee could wait no longer to post its

critical messages.

14

29.

The Committee installed the signs "as if the applications had been granted."
A true and accurate photo of the signs as they currently exist is attached hereto as
Exhibit 1.

C.     The City of Atlanta Orders the Committee to Remove its Signs.

30.

After the installation of the signs, the City sent an inspector to the premises.
The inspector issued two Violation Correction Notices.

31.

The first notice ordered the Committee and its leaders to "remove roof top
sign" by January 17, 2022.  The notice went on to state that failure to comply
would subject the Committee and its leaders to criminal prosecution, including a
$1,000 fine and jail time of up to 180 days.  Further, the City Code allows removal
of signs by the City in such circumstances with costs of removal to be paid by the
sign owner.

32.

The second notice ordered the Committee and its leaders to "remove illegal
roof sign and any other signs that cannot be permitted" on or before January 17,

15

2022.   The notice went on to state that failure to comply would subject the Committee and its leaders to criminal prosecution, including a $1,000 fine and jail time of up to 180 days.   Once again, the City Code allows removal of signs by the City in such circumstances with expenses charged to the owner of the signs.

33.

The Supreme Court has held that the loss of the freedom of speech for even one day is irreparable.   The Committee's signs are vital to its mission.   They serve several purposes, including notifying those passing by of the location of the Committee's headquarters where volunteers and contributors may visit.   The signs also urge onlookers to visit the Committee's website and social media outlets, such as the Committee's Twitter account.   Thus, the signs cannot be lost even for one day at this critical juncture in the process of approving the City of Buckhead.

34.

The City's enforcement action is being pursued for the improper purposes of squelching the Committee's activities and limiting the success of its mission. Notably, the same signs were in place for decades before the content was changed to support the Committee and the City of Buckhead.   A true and accurate

photograph showing the prior appearance of the signs has been attached hereto as Exhibit 2.  The City never took any enforcement action against the signs until the Committee's messages were added.  Moreover, the City has taken no action against literally thousands of signs which are illegal (unlike the Committee's signs) in the City.  For example, a true and correct copy of a photograph showing illegal signs promoting the election of Mayor Dickens is attached hereto as Exhibit 3.  The City of Atlanta's conduct is a direct result of its hostility to the Committee's mission.

D.     The City Threatens the Committee Based on the Parking Lot.

35.

On January 13, 2022, a City inspector returned to the Committee's office for purposes of further harassment.

36.

This time the inspector ordered the Committee and its leaders to "have spots marked for parking and handicap van access ready and clearly marked."  They were ordered to complete this work on or before January 25, 2022.  The notice went on to state that failure to comply would subject the Committee and its leaders to criminal prosecution, including a $1,000 fine and jail time of up to 180 days.

37.

Notably, the City Code sections cited in the notice do not pertain to parcels such as the Committee headquarters or parking lots of that type.

38.

The City's enforcement action is being pursued for the improper purposes of squelching the Committee's activities and limiting the success of its mission. Notably, the parking lot was in place before the Committee became a tenant on the parcel and the City never issued any threats to the property owner or prior tenants. Once again, the enforcement action results only from the City of Atlanta's disapproval of the Committee's goal to create a new City of Buckhead.

## **REQUEST FOR RELIEF**

## **COUNT ONE**

## **CONSTITUTIONAL VIOLATIONS**

39.

Plaintiff repeats paragraphs 1 through 38 above.

40.

The City of Atlanta has improperly used its power as the local governmental authority to disrupt, stifle, or chill the constitutionally-protected activities of the

18

Committee.  The City has threatened further repercussions, including incarceration and fines for the Committee and its leaders, if the Committee continues to speak freely and host assemblies of volunteers and supporters.

41.

The City's refusal to issue sign permits in a timely manner was unconstitutional in violation of the First Amendment, Fifth Amendment, and Fourteenth Amendment to the United States Constitution and the equivalent provisions of the Georgia Constitution.  Furthermore, the City Code provision that allows the City of Atlanta to unduly delay processing of sign applications is unconstitutional.   Applicants who suffer from such improper delays are not allowed to move forward to post their requested signs without taking tremendous risks, including fines and incarceration.  Thus, the City has reversed the proper mechanism and codified its support for "speech delayed is speech denied."

42.

The City's threats of citations and criminal prosecutions for signs that are lawful and appropriate were unconstitutional in violation of the First Amendment, Fifth Amendment, and Fourteenth Amendment to the United States Constitution

and the equivalent provisions of the Georgia Constitution.  To any extent the City's sign regulations subject those who would speak to criminal penalties based on discretionary or subjective standards, such rules are unconstitutional and invalid.

43.

The City's threats of citations and criminal prosecutions for bogus parking lot violations were unconstitutional in violation of the Fifth Amendment and Fourteenth Amendment to the United States Constitution and the equivalent provisions of the Georgia Constitution.  To any extent the City imposes criminal penalties based on discretionary or subjective standards, such rules are unconstitutional and invalid.

44.

Defendants' selective enforcement of the laws to prosecute a political rival violates free speech and the doctrines of equal protection and due process.

45.

Injunctive relief is appropriate to bring an end to Defendants' improper conduct and to protect the rights of the Committee and its leaders and supporters.

46.

Moreover, pursuant to 42 U.S.C. § 1983, damages are owed for all losses suffered by the Committee and, if such losses are difficult or impossible to quantify, presumed and/or nominal damages are owed.

47.

Pursuant to 42 U.S.C. § 1988, Plaintiff's legal fees and costs necessitated by its efforts to defend its constitutional rights should be reimbursed by Defendants.

WHEREFORE, Plaintiff Buckhead City Committee requests that this Court:

(a)    Enjoin the City of Atlanta from further unconstitutional conduct, including the enforcement of unconstitutional regulations as set forth herein;

(b)    Find for Plaintiff as to all claims set forth herein;

(c)    Award Plaintiff actual, presumed, general, and/or nominal damages in an amount to be proven at trial;

(d)    Award all reasonable costs and attorneys' fees incurred by Plaintiff;

(e)    Hold a trial by jury on all matters; and

(f)     For such other and further relief as the Court may deem just and

equitable.

DATED this 20th day January, 2022.

Respectfully submitted,

BY:     WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb
  Georgia Bar No. 743910
G. Franklin Lemond, Jr.
  Georgia Bar No. 141315

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 217-9950 (fax)
Adam@WebbLLC.com
Franklin@WebbLLC.com

*Attorneys for Plaintiff*