UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BUCKHEAD CITY COMMITTEE, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:22-CV-000234-SEG |
| CITY OF ATLANTA, GEORGIA, | |
| Defendant. | |

### O R D E R

This case is before the Court on Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Doc. 16). Having carefully considered the parties' positions and the applicable law, the Court enters the following order.

### I.    Background

At issue in this case are the City of Atlanta's municipal Sign Ordinance and enforcement actions with respect to Buckhead City Committee's premises. The following allegations are derived from Plaintiff's Amended Complaint (Doc. 13).

### A. The Buckhead City Committee Headquarters

Plaintiff, Buckhead City Committee ("BCC"), is a non-profit organization that advocates for the creation of Buckhead City—a city BCC hopes will be separately incorporated from the city of Atlanta (the "City"). (Am. Compl. ¶¶ 2,

4.)  BCC states that its campaign for Buckhead cityhood has thousands of supporters who are concerned about "rampant crime, Atlanta courts that release repeat criminal offenders without concern for law-abiding citizens, roads littered with potholes, broken sidewalks, poor services. . . high taxes, and political corruption." (*Id.* ¶ 3.)  BCC further states that "current leaders of the City of Atlanta have made it clear that they do not want the City of Buckhead to be approved." (*Id.* ¶ 4.)

Sometime in 2021, BCC opened a physical headquarters for its staff and volunteers in a building located on Peachtree Road "in the heart of the Buckhead community." (*Id.* ¶ 13.)  BCC wished to promote its campaign by placing three signs on its property: (1) a roof sign, (2) a wall sign on the front-facing exterior of the building, and (3) a freestanding sign in front of the building. (*Id.* ¶ 17.)  Because the prior occupant of the property, an art studio called Saville Studios, already had the physical infrastructure in place for these three signs, BCC needed only to change the text and design of the signs. (*Id.* ¶ 15.)  BCC hired a sign vendor and design firm to prepare and install its signs. (*Id.* ¶ 16.)

**B. BCC's Sign-Permit Applications**

BCC's sign vendor researched the City's Sign Ordinance provisions and determined that BCC did not require a permit to put up its desired signs. (*Id.*

¶ 18.)  The vendor based this determination on a provision of the City's Sign Ordinance that states: "Any sign allowed herein may contain any lawful message so long as said sign complies with the size, height, area and other requirements of this chapter."  (*Id.* (quoting ATLANTA, GA., CODE § 16-28A.007(g).)

Notwithstanding its view that sign permits were not required under the Sign Ordinance, BCC decided, "in an abundance of caution," to submit three sign-permit applications: one to change the message on the existing roof sign, one to change the message on the existing wall sign, and one to change the message on the existing freestanding sign.  (*Id.* ¶ 23.)  On October 13, 2021, BCC's sign vendor sent these applications to the City on behalf of BCC.  (*Id.*)  It was apparent that these applications were for signs promoting Buckhead cityhood, and any person reviewing the applications could see that they were submitted on behalf of BCC.  (*Id.*)  It is further undisputed that BCC failed initially to submit payment for its permit applications.  (*Id.* ¶ 24.)

On October 18, 2021, a "City staff member" contacted BCC's sign vendor to request payment for the permit applications.  (*Id.*)  BCC's sign vendor then submitted these payments.[1]  (*Id.*)

---

[1] BCC's Amended Complaint does not state the date on which the vendor submitted the permit application payment.

Upon payment, BCC's sign vendor monitored the permit process via the City's online permitting system, which stated that "the deadline for zoning department review of the applications was October 25, 2021." (*Id.* ¶ 24.) On October 26, 2021, because no permits had been issued, the vendor requested an update from the City on the status of the applications. (*Id.* ¶ 25.) The vendor was then told that the applications had just been sent to an inspector, who had 30 days from October 26, 2021 to review the applications. (*Id.*)

As discussed below, Atlanta's sign ordinance generally prohibits roof signs (*see* ATLANTA, GA., CODE § 16-28A.009(7)) except in limited instances when such signs were preexisting. BCC believed it was subject to the limited exception and contends that the City improperly delayed its request to erect its roof and other signs. According to the Amended Complaint, on October 27, 2021, BCC's sign vendor emailed the application inspector, requesting that the review of BCC's applications be expedited. (*Id.* ¶ 26.) A "City staffer" then engaged in what BCC describes as "a series of delaying tactics." (*Id.* ¶ 27.) In support of that assertion, BCC states that the staffer requested proof that the building's prior occupant had been issued a lawful permit for its roof sign and

additionally "raised other pretexts to delay and reject the requested permits." (*Id.*) [2]

Thirty-one days after BCC considers that its applications were "submitted," BCC had not received a decision from the City. So, BCC installed its three signs pursuant to Section 16-28A.013(b)(2) of the City's Sign Ordinance, which allows applicants to "at their own risk erect a sign meeting the requirements of this part as if the application had been granted" if their application is still pending for 30 days. ATLANTA, GA., CODE § 16-28A.013(b)(2). BCC's Amended Complaint does not state the date on which it considered its applications to have been "submitted." Neither does it state the date on which BCC installed its signs.

### C. The City's Code Enforcement Notices

Sometime after BCC installed its roof, wall, and freestanding signs, a City inspector allegedly came to BCC's property and issued two Violation Correction Notices. (Am. Compl. ¶ 30.) BCC alleges that the first notice ordered BCC to "remove [its] roof top sign" by January 17, 2022 and stated failure to do so "would subject [BCC] and its leaders to criminal prosecution,

---

[2] BCC does not explain why the staffer's inquiry was a delay tactic rather than a request for relevant information pertinent to determining the permissibility of the requested roof sign.

including a $1,000 fine and jail time of up to 180 days." (*Id.* ¶ 31.) The second notice allegedly ordered BCC to "remove [its] illegal roof sign and any other signs that cannot be permitted" by January 17, 2022. (*Id.* ¶ 32.) Again, failure to do so was said potentially to subject BCC to criminal prosecution. (*Id.*)

On January 13, 2022, a City inspector went to BCC's premises and issued a third notice, this time with respect to BCC's parking lot. (*Id.* ¶¶ 35-36.) This notice allegedly ordered BCC to "have spots marked for parking and handicap van access ready and clearly marked" by January 25, 2022. (*Id.* ¶ 36.) Once again, BCC was told that failure to comply with this notice would subject BCC and its leaders to potential criminal liability. (*Id.* ¶ 36.)

BCC alleges that the City's delay in reviewing its sign-permit applications and the City's enforcement actions against its roof sign and parking lot were part of an intentional effort to stifle BCC's expression and activities and limit the success of its campaign for Buckhead cityhood.

### D. Relevant Atlanta City Code Provisions

There are multiple provisions of Atlanta's City Code relevant to the Court's analysis of BCC's claims.[3]

---

[3] The Court may take judicial notice of the City's Sign Ordinance, which the City attached to its motion as an exhibit. *See, e.g., Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 & n.9 (11th Cir. 2013); *Tollis, Inc. v. County of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007) ("Municipal ordinances are

### 1.    Sign Permit Procedures

Atlanta's Sign Ordinance can be found in chapter 16-28A of the Code of Ordinances.  ATLANTA, GA., CODE § 16-28A.  Section 16-28A.013 outlines the City's sign permit procedures.  It provides, in part, "[n]o sign shall be placed, constructed, erected or modified without first securing a sign permit from the director."  § 16-28A.013(a)(i).  To obtain a sign permit, one must submit a permit application, which is not deemed accepted until "all fees are paid and all information reasonably required by the director is provided by the applicant."  § 16-28A.013(b)(1).

The provision at the heart of this litigation is the City's 30-day policy for reviewing sign-permit applications.  It states:

> All applications for sign permits shall be either issued or denied within 30 days of their submission.  If the sign permit is neither issued nor denied within this time period, the applicant may at their own risk erect a sign meeting the requirements of this part as if the application had been granted.

§ 16-28A.013(b)(2) (hereinafter the "30-Day Policy").

In reviewing a sign application under the 30-Day Policy, the director may either "(a) [i]ssue the sign permit if the sign(s) conform(s) in all respects to the

---

proper subjects for judicial notice").  BCC does not object to the Court taking judicial notice of the City's Code of Ordinances in its entirety.

requirement of this chapter" or "(b) [d]eny the sign permit if the sign(s) fail(s) in any way to conform to the requirements of this chapter." *Id.* If a sign, "erected for any reason, is not in compliance with these regulations," the director may take "appropriate action necessary to cause it to come into compliance or to be removed if illegal." *Id.* The Sign Ordinance also authorizes the director, at any time, to "inspect each sign regulated by this chapter 28A to ensure conformity with these regulations." § 16-28A.013(c). Put another way, the 30-Day Policy authorizes applicants to put up their signs if their applications are not reviewed within 30 days of submission. But, absent approval, they do so at their own risk, and with the knowledge that they may later be required to remove or modify them at their own expense.

### 2.    Roof Sign Prohibition

The Sign Ordinance generally prohibits roof signs. § 16-28A.009(7). A "roof sign" is defined as "[a] sign, any part of which is placed above, supported on, or extends above the top of a building, excluding parapet wall signs." § 16-28A.004. The prohibition is nearly categorical, but it has an exception. A roof sign "that was lawfully erected prior to the adoption of" the City Sign Ordinance is not unlawful. § 16-28A.004. Such a sign has lawful "nonconforming" status and need not be removed or modified. § 16-28A.013(a)(ii).

8

### 3. Parking Lot Ordinance

Section 16-28.014 of the City Code regulates off-street parking requirements and provides that "[r]equired off-street parking areas for four or more automobiles shall have individual spaces marked."[4]  § 16-28.014(1).

## II. Procedural History

On January 20, 2022, BCC filed this lawsuit against the City and Mayor Andre Dickens.  (Doc. 1.)  The City moved to dismiss BCC's complaint on March 28, 2022.  (Doc. 6.)  On April 18, 2022, BCC filed an amended complaint (Doc. 13), which removed Mayor Dickens as a defendant, and a response to the City's motion to dismiss (Doc. 14), stating that BCC's original complaint was mooted and superseded by its amended complaint.  The City then withdrew its motion to dismiss the original complaint and notified the Court of its intent to re-file its motion with respect to the Amended Complaint.

On May 2, 2022, the City filed the instant Motion to Dismiss Plaintiff's Amended Complaint.  (Doc. 16.)  BCC submitted its response to the City's motion on May 16, 2022 (Doc. 18), and the City replied on May 31, 2022 (Doc. 19).

---

[4] Though it is unclear whether BCC's parking lot was a "required" off-street parking area, BCC does not appear to dispute this provision's applicability to its premises.

9

### III.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although detailed factual allegations are not required, the pleading must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Importantly, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a complaint to be "plausible on its face," the facts alleged must "allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wooten v. Quicken Loans, Inc.* 626 F.3d 1187, 1196 (11th Cir. 2010). While all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), a court need not accept as true the plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal*, 556 U.S. at 678.

Accordingly, evaluation of a motion to dismiss entails a two-pronged approach: (1) a court must identify any allegations in the pleading that are merely legal conclusions to which the "assumption of truth" should not apply, and (2) where there are remaining well-pleaded factual allegations, a court

should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

## IV.   Discussion

BCC's Amended Complaint (Doc. 13) contains five claims: a First Amendment challenge (facial and as-applied) under the United States and Georgia constitutions (Count I);[5] (2) First Amendment retaliation (Count II); selective enforcement (Count III); an equal protection challenge (Count IV); and a claim styled as "Injunction." (Count V).[6]

### A. Standing

The Court begins with the threshold issue of whether BCC has standing to pursue its claims. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1266 (11th Cir. 2006) ("It is by now axiomatic that a plaintiff must have standing to invoke the jurisdiction of the federal courts."). "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v.*

---

[5] BCC asserts its facial and as-applied First Amendment challenges as one claim in Count One of its Amended Complaint, but the allegations set forth in that count suggest that these are distinct theories of liability.

[6] The Court dismisses BCC's "claim" for "Injunction" because an injunction is a remedy, not its own legal claim. *See Roma Outdoor Creations, Inc. v. City of Cumming*, 558 F. Supp.2d 1283, 1285 n.3 (N.D. Ga. 2008) (dismissing a plaintiff's cause of action for "injunctive relief" because it was "merely [a] request[] for relief and not [a] freestanding legal claim[]"). This dismissal does not foreclose the possibility of injunctive relief in this case.

*Defenders of Wildlife, et al.*, 504 U.S. 555, 560 (1992).  A plaintiff must establish "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the [conduct complained of], and (3) a likelihood that the injury will be redressed by a favorable decision."  *Granite State Outdoor Advert., Inc. v. City of Clearwater*, 351 F.3d 1112, 1116 (11th Cir. 2003) (emphasis omitted).  Each element is "an indispensable part of the plaintiff's case" and "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."  *Lujan*, 504 U.S. at 561.  Because "standing is not dispensed in gross," the Court must determine whether BCC has "standing for each claim [it] seeks to press and for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).  There do not appear to be any disputed factual issues related to standing.

### 1.  Standing to Bring First Amendment Facial Challenge

BCC brings a facial challenge to the City's 30-Day Policy, alleging that it is unconstitutional on its face because it gives City officials unbridled discretion over whether or not to issue a sign permit.  The 30-Day Policy, it is alleged, encourages viewpoint discrimination because the City has broad power to delay approval for certain signs, lead applicants to incur the expense of erecting as-yet-unapproved signs, and then require signs to be taken down.

12

It is long settled that "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988).  In other words, "a plaintiff has standing to facially challenge a law that allegedly grants unbridled discretion as long as the plaintiff 'is subject to' or 'imminently will be subject to' that particular law." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1220 (11th Cir. 2017) (quoting *CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1274 (11th Cir. 2006)).

For example, in *CAMP*, a case involving a First Amendment facial challenge to an ordinance governing outdoor festivals, the Eleventh Circuit Court of Appeals held that "a plaintiff had standing to challenge regulations that purportedly granted unbridled discretion to city officials because the plaintiff had applied for permits in the past and intended to apply for permits in the future, and those permit applications were or would be subject to the challenged regulations."  *Barrett*, 872 F.3d at 1220 (citing *CAMP*, 451 F.3d at 1274-75).  Whether or not the city officials had exercised their discretion to actually refuse the plaintiff's permit applications was immaterial for standing purposes because it was the alleged "existence, not the imposition, of

13

standardless requirements that cause[d] [the plaintiff's] injury." *CAMP*, 451 F.3d at 1275.

Here, like the plaintiff in *CAMP*, BCC applied for municipal permits, and its applications are governed by an allegedly unconstitutional ordinance (here, the 30-Day Policy). Setting aside, for the moment, the merits question of whether the 30-Day Policy actually grants city officials unbridled discretion, BCC has adequately alleged that it was "subject to" the contested permitting provision. Specifically, BCC states that it wishes to promote its viewpoints in part through signage on its property, that it submitted permit applications in accordance with the City's Sign Ordinance, and that the City has intentionally delayed its applications under the 30-Day Policy because the City opposes its messages. These "general factual allegations of injury resulting from the defendant's conduct" are sufficient at the pleading stage. *Bischoff v. Osceola County*, 222 F.3d 874, 878 (11th Cir. 2000). Thus, BCC has standing to bring a facial challenge to the City's 30-Day Policy.

### 2. Standing to Bring First Amendment As-Applied Challenge

BCC also brings a First Amendment as-applied challenge against the City's 30-Day Policy. BCC's alleged injury with respect to this claim is the City's delay in processing its sign-permit applications, which purportedly caused BCC to delay posting its signs and subjected BCC to a risk of criminal

prosecution.  The first part of the *Lujan* test (injury) is easily satisfied here.  A plaintiff whose speech rights are infringed by the government—even for short periods of time—suffers a cognizable injury.  *See Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("We have repeatedly held that harms to speech rights for even minimal periods of time, unquestionably constitute irreparable injury").  Additionally, an injury exists where a "plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Am. Charities for Reasonable Fundraising Regul., Inc. v. Pinellas County*, 221 F.3d 1211, 1214 (11th Cir. 2000).  When this happens, the plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."  *Babbit v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979).  Further, a plaintiff suffers a concrete injury based on a threat of prosecution when that threat is "genuine" and not "speculative or imaginary."  *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1329 (11th Cir. 2000).

Here, in addition to alleging a delay in installing its signs, BCC has also alleged a "credible threat" that the City will prosecute it for violations of the Sign Ordinance.  *Am. Charities*, 221 F.3d at 1214.  The City's alleged delay in processing BCC's applications left BCC in a "limbo" state in which it installed

signs without knowing whether they were lawful.  Indeed, while awaiting the City's decision on its application, BCC was issued violation notices for its roof sign.  Such notices raise the risk of injury out of the realm of "speculative or imaginary" and into the realm of particularized and concrete.

The City argues that "BCC's allegations make clear that it is not an applicant that suffered any delay."  (Doc. 16 at 5.)  However, whether BCC's First Amendment rights were violated as a result of the City's alleged delay is a merits question that is distinct from the issue of standing.  *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal").  For standing purposes, the Court accepts BCC's allegations that it suffered an injury in the form of "delay[ing] posting its signs" and being at "risk of criminal prosecution by the City, including jail time, fines, liens, and seizure of signs."  (Am. Compl. ¶ 43.)  As a result, BCC has adequately alleged an injury for standing purposes with respect to its as-applied First Amendment challenge.

Further, BCC satisfies the causation and redressability requirements for standing with respect to its as-applied claim.  To the extent BCC has faced delays in posting its signs and the prospect of criminal prosecution as it awaits final determination of its permits, those injuries can be traced to the City's alleged delay in reviewing BCC's applications.  And BCC's injury is redressable

in this action because a favorable verdict would enable BCC to install its lawful signs without fear of having to remove them or of potential criminal prosecution.   BCC has standing to bring its as-applied First Amendment challenge.

### 3.  Standing to Bring First Amendment Retaliation Claim

BCC alleges that the City retaliated against it for engaging in protected speech activities in support of Buckhead cityhood.  To state a claim for First Amendment retaliation, a plaintiff must show: (1) "he engaged in protected speech"; (2) "the defendant's conduct adversely affected the protected speech"; and (3) "a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480-81 (11th Cir. 2016). The alleged retaliatory acts here are (1) the "City's undue delay in handling sign permit applications," and (2) the "City's threats of criminal prosecutions" related to BCC's roof sign and parking lot.  (Am. Compl. ¶ 49.)

In the context of First Amendment retaliation claims, the Eleventh Circuit has adopted an objective test to determine whether a plaintiff's protected speech was "adversely affected" by a defendant. *Bennett v. Hendrix*, 423 F.3d 1247, 1251 (11th Cir. 2005).  In analyzing such a claim, the Court looks to whether the defendant's conduct would likely deter "a person of ordinary firmness" from exercising his speech rights—not whether the

plaintiff's speech was "actually chilled." *Id.* at 1252. Despite the objective nature of this test, however, for standing purposes, a plaintiff is not relieved of the burden of demonstrating a "distinct and palpable" injury, as opposed to one that is "abstract, conjectural, or hypothetical." *Id.* at 1253.

In this case, BCC has adequately alleged for standing purposes that the City's allegedly retaliatory acts caused it injury. BCC's allegation that the City caused BCC to experience a delay in installing its signs is sufficient to find standing satisfied at the motion-to-dismiss stage. The Court likewise finds BCC has adequately alleged an injury with respect to the City's "threats of criminal prosecutions" relating to the enforcement notices it issued to BCC. Because failure to comply with the City's three enforcement notices would subject BCC to potential criminal liability, the notices created a genuine threat of prosecution and brought BCC's alleged injury out of the realm of "abstract" harms.

BCC also satisfies the causation and redressability elements of standing because its alleged injuries—experiencing a delay in installing signs and being subject to potential criminal prosecution—are directly traceable to the City's conduct, and a favorable decision on this claim would remedy BCC's alleged injuries. BCC has standing to bring its First Amendment retaliation claim.

### 4. Standing to Bring Selective Enforcement Claim

BCC's selective enforcement claim under the Equal Protection Clause alleges that City officials enforced certain provisions of the City Code against BCC but did not do the same against other, similarly situated comparators. Once again, the alleged injuries for this claim are the delays BCC experienced in the sign-permit application process and the enforcement notices BCC received relating to its roof sign and parking lot. As with BCC's as-applied challenge and First Amendment retaliation claim, the Court finds BCC has generally alleged injuries-in-fact, that it plausibly alleges the City's selective enforcement caused those injuries, and a favorable verdict on this claim coupled with the requested injunctive relief would redress BCC's injuries. Therefore, BCC has standing to bring this claim.

### 5. Standing to Bring Equal Protection Claim

BCC brings an equal protection claim pursuant to the Fourteenth Amendment, arguing that Section 16-28A.012 of the Sign Ordinance favors government speech over private speech. Section 16-28A.012 regulates "[s]igns in the public right-of-way." Specifically, this section of the Sign Ordinance prohibits all signs from being placed in the public right-of-way except in the cases of ten enumerated exceptions. These enumerated exceptions include:

> [s]igns erected by or on behalf of a governmental body to post legal notices, identify public property, convey public information, and direct or regulate pedestrian vehicular traffic[;] . . . [b]us stop signs erected by a public transit authority[;] . . . [i]nformational signs of a public utility identifying its poles, lines, pipes or other facilities[;] . . . [t]emporary emergency warning signs erected by a government agency[;] . . . [n]eighborhood identification signs.

ATLANTA, GA., CODE § 16-28A.012.  In short, Section 16-28A.012 bans signs from the public right-of-way, except when the sign is placed, by a government agency or utility company, for a public purpose such as directing traffic, providing information about utility structures, designating bus stops, or communicating emergency information (among other, similar reasons).

How this code section violates the Equal Protection Clause is not made clear in the Amended Complaint.  BCC contends that it "allows City officials to post whatever signs it wishes directly in front of [BCC's] offices without even seeking a permit."  (Am. Compl. ¶ 61.)  Read in the light most favorable to the plaintiff, BCC appears to argue that Section 16-28A.012 violates the Equal Protection Clause because it allows the government or a utility provider to place traffic signs, utility postings, and emergency notifications in the public right-of-way while prohibiting private persons or entities from doing the same. Setting aside the dubious merit of that contention, BCC lacks standing to challenge Section 16-28A.012.

A plaintiff has standing to bring a facial challenge only against provisions of an ordinance that "affect its activities." *CAMP*, 451 F.3d at 1273. Even when bringing a facial challenge, nothing relieves a plaintiff from showing that it "has sustained or is immediately in danger of sustaining a direct injury as the result of" the challenged provision. *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)). Further, the constitutional standing prerequisite mandates that a plaintiff's alleged injury is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560; *see also Granite State Outdoor Advert., Inc. v. Cobb County,* 193 F. App'x 900, 906 (11th Cir. 2006).

Here, BCC is without standing to challenge Section 16-28A.012 because it has not alleged any facts to show that the right-of-way provision affected its activities in any way or will affect them in the future. Nor would a favorable decision on this claim redress BCC's alleged injuries. The bases for BCC's suit are (1) the alleged delay in consideration of BCC's roof, wall, and freestanding sign-permit applications, and (2) the City's alleged threats of prosecution related to BCC's roof sign and parking lot. BCC has not alleged that it applied for a permit to place a sign in the right of way, that it intends in the future to apply for such a permit, or that the right-of-way provision affected its right to expression or any other right. BCC simply has not alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest,

but proscribed by" the right-of-way provision. *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001). Further, even if BCC were to prevail on its equal protection claim regarding the right-of-way provision, BCC's alleged injuries would remain unaddressed. Invalidation of the right-of-way provision would do nothing to expedite the City's review of BCC's sign-permit applications or remedy the alleged threats of prosecution regarding the roof sign and parking lot issues. Thus, BCC does not have standing to pursue its equal protection claim regarding the right-of-way provision of the Sign Ordinance. BCC's equal protection claim is **DISMISSED**.

## B. *Monell* Liability

As a general rule, governmental entities "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Instead, a governmental entity "may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 133 (1988) (internal quotation marks and citation omitted). Therefore, to establish a municipality's liability under § 1983, a plaintiff must allege that her constitutional injury was the result of either an officially promulgated policy, or an unofficial custom or practice. *Grech v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003). The

requirement that a plaintiff's injury was caused by a policy or custom "prevents the imposition of liability based upon an isolated incident." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004); *see also Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("Normally random acts or isolated incidents are insufficient to establish a custom or policy"). Because a municipality rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs "must show that the [municipality] has a custom or practice of permitting it and that the [municipality's] custom or practice is the moving force behind the constitutional violation." *Grech*, 335 F.3d at 1330 (internal quotation marks and alterations omitted).

The City contends that, to the extent BCC seeks to hold it liable for the acts of its employees, *Monell* blocks liability. Specifically, the City argues that *Monell* applies to BCC's First Amendment as-applied challenge, First Amendment retaliation claim, and selective enforcement claim because they seek to impute liability on the City for the acts of a "City staffer" (who allegedly engaged in improper "delaying tactics" with BCC's application) and two inspectors (who allegedly targeted BCC by issuing notices for its roof sign and parking lot violations). (Am. Compl. ¶¶ 27, 30-32, 35-36.) According to the City, the alleged wrongdoing of these individual employees cannot form the

basis of the City's liability because their acts do not represent official policy or an unofficial custom.  (Doc. 16 at 11.)  The Court must assess whether BCC has satisfied the *Monell* standard as to each of its asserted grounds for municipal liability—the City's alleged delay in BCC's sign-permit application process and the City's alleged enforcement actions taken with respect to BCC's roof sign and parking lot.

### 1. The City's Alleged Delay in the Sign-Permit Application Process

The Court begins with whether BCC has adequately alleged a custom or policy of improper delay pursuant to the 30-Day Policy.  This is a close call, made more so by BCC's failure to plead more precisely such liability in its Amended Complaint.  That said, reading all inferences in the Amended Complaint in the light most favorable to BCC, BCC has sufficiently identified a government policy on which to base its claims against the City as they relate to the City's alleged delay in the sign-permit application process.

BCC alleges that the 30-Day Policy is an unconstitutional, as-applied, express policy because it "allows the City of Atlanta to unduly delay processing of sign applications" in ways that "disrupt, stifle, and chill" protected speech. (Am. Compl. ¶¶ 41, 44.)  The challenged policy allegedly puts sign applicants in an untenable position in which they must either erect their signs knowing

they may later have to remove them (and pay the costs) or wait to engage in expressive conduct for a period of undetermined and unknowable length. (*Id.* ¶ 41.)  According to BCC, the City's policy in this regard requires applicants to take "tremendous risks," in any decision to erect an as-yet-unapproved sign, including "fines and incarceration."  (*Id.* ¶ 41.)  The Court finds that the 30-Day Policy meets the requirements of a government policy under *Monell*: that is, it is "officially adopted by the municipality." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005); *see also Hassan v. City of Atlanta*, No. 1:21-CV-4629-TWT, 2022 WL 1778211, at *3 (N.D. Ga. June 1, 2022) (finding plaintiff sufficiently alleged liability under *Monell* where city officers arrested plaintiff-journalist, but did so under a curfew imposed by city executive order).

BCC's claim is not, contrary to the City's argument, based just on the alleged acts of a rogue city staffer.  BCC alleges instead that the delay it experienced is baked into and fully consistent with the 30-Day Policy.  The staffer, BCC alleges, was *conforming to* the 30-Day Policy in delaying review within 30 days, not *departing* from it.  (*Cf.* Doc. 16 at 10.)  BCC has a point. While one part of the permitting ordinance provides that all applications "shall be either issued or denied within 30 days" (ATLANTA, GA., CODE § 16-28A.013(b)(2)), the very next sentence contemplates that there will be times when the 30-day window will not be satisfied, and provision is made for how

25

an applicant may proceed when permits are not issued or denied within the 30-day timeframe. (*Id.*) In the same paragraph, it is further specifically provided that the director may issue sign permits or deny them based on applications which have been "filed for more than 30 days." Put another way, the 30-Day Policy, despite its name and some language to the contrary, arguably permits the City to take longer – even much longer – than 30 days to decide to issue or deny a permit. As such, BCC is challenging a municipal policy.

### 2. The City's Alleged Enforcement Actions Against BCC's Roof Sign and Parking Lot

A threshold requirement of municipal liability is for the plaintiff to show "that his constitutional rights were violated." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1333 (11th Cir. 2021). Later in this order, the Court finds that BCC has failed to adequately allege that the City violated its constitutional rights with respect to the notices issued against BCC's roof sign and parking lot. As a result, BCC's claims cannot survive the City's *Monell* challenge as it relates to these enforcement actions taken by the City.

### C. Merits

### 1. First Amendment (Facial Challenge)

Normally, a plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the law would be valid or show that the law lacks "a plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021). In the First Amendment context, however, there is "a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*. (citing *United States v. Stevens*, 559 U.S. 460, 473 (2010)). Neither party directly addresses the application of this overarching legal principle in its brief. However, the parties appear to agree on the pivotal question at issue in this facial challenge: whether the alleged absence of a hard-and-fast time limit in the Sign Ordinance renders the ordinance unconstitutional.

BCC contends the 30-Day Policy violates the First Amendment on its face because it does not require City officials to make timely decisions on sign applications, and thus invites the possibility of viewpoint discrimination. In considering BCC's argument, the Court must first decide whether the Sign Ordinance is a content-based regulation of speech or, instead, a content-neutral permitting scheme. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d

27

1250, 1259 (11th Cir. 2005) ("[W]e first inquire whether the Ordinance is content-neutral."); *Granite State Outdoor Advert., Inc. v. City of St. Petersburg*, 348 F.3d 1278, 1281 (11th Cir. 2003) (explaining that content-based speech regulations must contain more robust procedural safeguards than content-neutral permitting schemes). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994). In contrast, an ordinance is content neutral if it "serves purposes unrelated to the content of expression" and regulates speech in a manner that is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1981)). "The government's objective in regulating speech is the controlling consideration." *Granite State*, 348 F.3d at 1281.

Here, the City enacted its Sign Ordinance to "protect the health, safety and general welfare" of Atlantans, "provide safe operating conditions for pedestrian and vehicular traffic," "preserve the value of property," and "maintain an aesthetically attractive city." ATLANTA, GA., CODE § 16-28A.003. None of these objectives relates to the expressive content of any sign. Additionally, the Sign Ordinance's permitting policy does not treat permit

28

applications differently based on their messages or content. Instead, the Sign Ordinance allows signs to "contain any lawful message so long as said sign complies with the size, height, area and other requirements of this chapter." § 16-28A.007(g). Similar ordinances have been found to be content neutral, and the Court finds this one to be, too.[7] *See, e.g., Granite State*, 348 F.3d at 1282 (finding sign ordinance content neutral where it was enacted to "(1) promote uniformity, (2) preserve aesthetics, and (3) foster safety").

Next, the Court must ascertain whether the City's content-neutral Sign Ordinance is unconstitutional on its face. BCC alleges that the conditional-approval component of the 30-Day Policy allows the City to take an "unlimited amount of time to make a decision on a sign application." (Doc. 18 at 16.) The failure to set a reasonable time limit on permitting decisions, BCC contends, affords City officials improper discretion over sign-permit applications. The idea is that the City can engage in viewpoint discrimination by quickly approving signs it likes and delaying applications where the City does not approve of the sign's proposed message.

---

[7] BCC does not dispute that the Sign Ordinance is content neutral. (*See* Doc. 18 at 20.) Neither does it deny that the Sign Ordinance lacks "a plainly legitimate sweep." *Ams. for Prosperity Found.*, 141 S. Ct. at 2387.

The Court agrees with BCC on one important aspect of the 30-Day Policy – it provides no real deadline by which the City must decide on issuing or denying a sign permit. While the Sign Ordinance states in part that applications "shall be either issued or denied within 30 days of their submission," it also specifically and repeatedly contemplates that many applications will *not*, in fact, be reviewed within 30 days. And, as a practical matter, it permits city officials to extend without limit the period of review because the City reserves the right to deny an application, and to direct an applicant to remove a sign, at any point after the 30-day window. ATLANTA, GA., CODE § 16-28A.013(b)(2). For instance, City officials could, under the ordinance, deny a sign-permit application, say, a full year after it was submitted. And the rejected sign could not be erected, or if already installed, would have to be removed. The Sign Ordinance may as well lack a time limit altogether.

The absence of a meaningful time limit in the permitting policy, however, does not end the Court's inquiry. The Eleventh Circuit has made clear that "time limits are not *per se* required" for a content-neutral permitting scheme to be valid. *Granite State*, 348 F.3d at 1279. Instead, when assessing the constitutionality of such a permitting scheme, courts "are simply required to

assess whether the ordinance contains adequate standards to guide official decisionmaking." *Id.* at 1282.

In *Granite State*, the Eleventh Circuit upheld a content-neutral sign permitting scheme even though it did not require city officials to process an application within any certain time period. *Id.* Specifically, the court found that the ordinance contained "adequate standards to guide official decisionmaking" because city officials could "only process permit applications based upon objective criteria set forth in the ordinance." *Id.* The "objective criteria" included restrictions based on size, height, proximity to roads, and other requirements that were unrelated to the proposed content of the sign. *Id.* at 1282 n.4.

Here, like the ordinance in *Granite State*, the City's Sign Ordinance contains adequate, objective standards to guide City officials' decisionmaking in reviewing sign-permit applications. For example, Section 16-28A.010(19) of the Sign Ordinance regulates the height, size, number, and form of signs placed in the Buckhead Village District.[8]  The Sign Ordinance also provides blanket

---

[8] BCC alleges, and the City does not dispute, that BCC's headquarters are in the Buckhead Village District and that the ordinance cited above governs BCC's proposed signs.

prohibitions on certain kinds of signs, including roof signs.  § 16-28A.009.[9]  And as noted above, the Sign Ordinance allows a sign to contain "any lawful message" so long as it complies with the ordinance's objective requirements. § 16-28A.007(g).   No provision cited above considers the content of a sign's message; rather, each such provision is based on objective criteria, just like the ordinance in *Granite State*.

In this case, BCC's facial challenge is narrow and focuses only on the 30-Day Policy.  For the reasons stated above, that policy does not violate the First Amendment in all of its applications.  *Ams. for Prosperity Found.*, 141 S. Ct. at 2387.  To the extent that BCC alleges the City's abuse of the policy, "abuse must be dealt with if and when a pattern of unlawful favoritism appears." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002).  As was the case in *Granite State*, the Court is "reluctant to invalidate an entirely legitimately-enacted ordinance absent more of a showing" that it poses a constitutional problem on its face.  348 F.3d at 1282.  Accordingly, BCC's facial challenge to the City's 30-Day Policy is **DISMISSED**.[10]

---

[9] BCC does not challenge, in this lawsuit, the City's general prohibition against roof signs or the Sign Ordinance's treatment of preexisting roof signs. Its First Amendment challenge is limited to the 30-Day Policy.

[10] Although BCC's First Amendment challenge alleges a violation of both the United States and Georgia constitutions, neither side has briefed the issue as

### 2.  First Amendment (As-Applied Challenge)

Aside from the *Monell* argument discussed above, the City moves to dismiss the as-applied First Amendment challenge on only one ground: it says that BCC caused any delay that occurred in the processing of its sign applications.  (Doc. 16 at 11-12.)  Specifically, the City contends that BCC failed to submit with its applications "all information reasonably required" for a permit, including proof of non-conforming status for the prohibited roof signs.  (*Id*.)  The problem with the City's argument is that the "permit procedures" section of the Sign Ordinance, § 16-28A.013(b), does not say that an applicant needs to submit, with its application, proof that a preexisting roof sign had been issued a lawful permit.  Nothing in the Sign Ordinance

it relates to the Georgia Constitution.  Regardless, the Court reaches the same conclusion under the Georgia Constitution as it has under the federal Constitution.  "[I]n analyzing sign ordinances, Georgia courts have consistently applied United States Supreme Court precedent, drawing no analytical distinction between the state and federal constitutions." *Lamar Adv. Co. v. City of Douglasville*, 254 F. Supp.2d 1321, 1334 (N.D. Ga. 2003) (citing *State v. Cafe Erotica, Inc.*, 507 S.E.2d 732 (Ga. 1998); *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.*, 467 S.E.2d 875 (Ga. 1996); *H & H Operations, Inc. v. City of Peachtree City*, 283 S.E.2d 867 (Ga. 1981)). For that reason, separate analysis under the Georgia Constitution will "not change the court's prior analysis and, accordingly, is unnecessary." *Roma Outdoor Creations, Inc. v. City of Cumming*, 599 F. Supp.2d 1332, 1346-47 (N.D. Ga. 2009) (citing *Southlake Prop. Assocs., Ltd. v. City of Morrow*, 112 F.3d 1114 (11th Cir. 1997)); *Outdoor Sys., Inc. v. City of Atlanta*, 885 F. Supp. 1572, 1584 (N.D. Ga. 1995)).

can be fairly read to put an applicant on notice that it must submit previously-issued city permits for preexisting signs, along with its application.  So it cannot be said that BCC "delayed" when it failed initially to submit documentation it had no reason to suppose it needed to provide.  And whether BCC delayed at some *later* point after it was told it needed to provide this information is really a fact question not pertinent at this stage.

The question of what, if any, delay occurred in this case will be pivotal as the case moves forward.  The Eleventh Circuit closely scrutinizes harms to speech rights, even when speech is affected for "minimal periods of time."  *Scott*, 612 F.3d at 1295.  Thus, a key question in determining the constitutionality of an ordinance regulating speech is the extent to which it hampers the plaintiff's expressive activities.  In analyzing BCC's as-applied challenge, it must be said that BCC's Amended Complaint leaves many questions as to whether and/or how the 30-Day Policy delayed BCC's protected speech.  In a case in which BCC's claims center around timing and alleged delay, BCC has failed to plead the dates on which several key events occurred.  For example, BCC does not allege: the date on which its vendor paid the permit-application fee (Am. Compl. ¶ 24.)[11]; the date on which the

---

[11] This omission is particularly significant because the Sign Ordinance provides, "[n]o application shall be deemed to be accepted by the director

"staffer requested proof that the sign had been issued a lawful permit" (*Id.*
¶ 27); the date on which BCC responded to the request for proof; the date on
which BCC installed its signs; or the date on which a City inspector went to
BCC's premises and issued a notice indicating code violations.  Moreover,
BCC's Amended Complaint does not state whether its permit applications
have been approved or whether they are still pending.  BCC's failure to allege
such pertinent information is puzzling given the legal claims raised in this
case.

     Here again, however, the Court must accept Plaintiff's factual
assertions as true and draw all reasonable inferences in its favor.  BCC
alleges that the City opposes its cause and its message.  It describes a series
of interactions with city officials that it says suggest an intent to obstruct
BCC from spreading its message about Buckhead cityhood.  It says it was put
in a difficult position when it was required either to forego its signage, or to
expend funds on signs it might have to later take down.  It further alleges it
was harmed by the delay because its message was and is time sensitive.

---

unless all fees are paid and all information reasonably required by the
director is provided by the applicant."  ATLANTA, GA. CODE § 16-
28A.013(b)(1).  Without knowing when BCC properly "submitted" its
application, it is impossible to know when the City's 30-day review period
began and, consequently, how long of a delay BCC actually suffered in its
sign-permit application process.

BCC may face a difficult path as the case proceeds.  The City is right that the alleged "delaying tactics" are not well fleshed out in the Amended Complaint.  And if they consist solely or mainly of the "City staffer" requesting "proof that the [roof] sign had been issued a lawful permit," such request does not seem inconsistent with the City Ordinance requirement that nonconforming signs be "lawfully permitted" to attain lawful status. ATLANTA, GA., CODE § 16-28A.004.  Discovery may reveal the scope and nature of the delay BCC experienced, and whether, as Plaintiff alleges, the delays were intentional.  At this early stage, however, the Amended Complaint plausibly alleges that BCC's application was delayed, causing, in turn, a delay in the date on which BCC could put up its signs.  As the City makes no further argument regarding the as-applied challenge, the motion to dismiss it is **DENIED**.[12]

### 3. First Amendment Retaliation

To state a claim for First Amendment retaliation under § 1983, a plaintiff must show: (1) "he engaged in protected speech"; (2) "the defendant's

---

[12] As noted with respect to BCC's facial First Amendment challenge, BCC brings the as-applied claim under both the federal and Georgia constitutions. Again, because Georgia courts draw no analytical distinction between the two when analyzing sign ordinances, the result is the same under the Georgia constitution. *Roma Outdoor*, 599 F. Supp.2d at 1346-47.  "Separate analysis under the Georgia Constitution" is therefore "unnecessary." *Id*.

retaliatory conduct adversely affected the protected speech"; and (3) "a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey*, 843 F.3d at 480-81.

Here, BCC's Amended Complaint alleges that the City retaliated against BCC for engaging in First Amendment activities by (1) delaying consideration of its sign-permit applications and (2) threatening criminal prosecution for violation of the roof sign and parking lot ordinances.  The parties do not dispute that BCC satisfies the first requirement for a § 1983 First Amendment retaliation claim because BCC's expressions of advocacy for the creation of Buckhead City is constitutionally protected speech.   The other two requirements are in dispute.

### a. Enforcement Notices

BCC alleges that the City retaliated against it by issuing enforcement notices stating that BCC could be subject to penalties for ordinance violations. Assuming, *arguendo*, that BCC satisfies the second element of a First Amendment retaliation claim with respect to the enforcement notices it received from the City, its claim still falls short because it fails to satisfy the third element.

The third prong of a First Amendment retaliation claim, the causal-connection element, requires the plaintiff to show the defendant was

37

subjectively motivated to retaliate because the plaintiff engaged in protected speech. *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011). To allege a causal connection, a plaintiff must identify a "sequence of events from which one could . . . plausibly infer a retaliatory motive." *Smith v. Fla. Dep't of Corr.*, 375 F. App'x 905, 911 (11th Cir. 2010) (per curiam). Further, to establish a causal connection based on retaliatory criminal prosecution, "a plaintiff must plead and prove more than the subjective retaliatory animus of a government official and a plaintiff's subsequent injury; the plaintiff must also plead and prove *the absence of probable cause for the underlying retaliatory criminal prosecution*." *Id.* (citing *Hartman v. Moore*, 547 U.S. 250, 260-61 (2006)) (emphasis added). Thus, "[u]nder *Hartman*, if there is probable cause for the underlying criminal prosecution, then the § 1983 First Amendment retaliatory criminal prosecution case ends as a matter of law." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1292 (11th Cir. 2019).

Here, BCC cannot show that the City acted with a retaliatory motive in issuing notices against BCC's roof sign and parking lot because probable cause existed for the notices. The City's Sign Ordinance expressly prohibits roof signs unless the sign is legally nonconforming. ATLANTA, GA., CODE § 16-28A.004; *see also* § 16-28A.014(b) ("A nonconforming sign may remain in use subject to the requirements of chapter 24 . . . ."). Further, the City's Parking

Lot Ordinance requires certain off-street parking areas to have "individual spaces marked." § 16-28.014. The photograph of BCC's premises that it attached to its Amended Complaint shows that it was plainly in violation of both these provisions. (Doc. 13-1.) BCC does not dispute this, nor does it allege that its roof sign had lawful nonconforming status. (*See* Am. Compl. ¶ 27.) In fact, BCC admits that when the City requested proof that its roof sign was lawful—what BCC describes as a request for "bogus documentation" (Doc. 18 at 19)—BCC failed to provide any records or permits. (*See id.*) As a result, "the chain of causation from animus to injury" was broken by BCC's failure to plead "the absence of probable cause" for the notices it received. *DeMartini*, 942 F.3d at 1292. Thus, BCC's First Amendment retaliation fails to the extent it is based on the City's issuance of these notices.

### b. Alleged Delay in Permit Application Review

To satisfy the second element of its First Amendment retaliation claim with respect to delay, BCC must plausibly allege that the City's delay in issuing a sign permit adversely affected its constitutionally protected speech. A defendant adversely affects protected speech if its alleged retaliatory conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bailey*, 843 F.3d at 481 (quoting *Bennett*, 423 F.3d at

1254).  Because this is an objective standard, a plaintiff need not show that its speech was "actually chilled." *Bennett*, 423 F.3d at 1251-52.

Applying that standard to this case, the relevant question is whether the City's alleged delay in considering BCC's sign-permit applications, during which time BCC was allowed to conditionally put its signs up, would "likely deter a person of ordinary firmness" from exercising his First Amendment rights.  Here, the Amended Complaint says just enough to satisfy this standard.  A person of ordinary firmness might indeed be deterred from putting up expressive signs under the 30-Day Policy for fear that (1) he might have to later pay to remove them, or (2) he might face penalties for erecting a sign that is later determined to be non-conforming.  Of course, the scope of the delay remains to be determined, as does the factual issues as to whether any delay was indeed retaliatory.  But the second element is satisfied at the pleading stage.

As to the third element, BCC sufficiently alleged that a causal connection exists between BCC's speech and the alleged retaliatory delay.  *Bailey*, 843 F.3d at 480-81.  To establish a causal connection, a plaintiff must show that a defendant was subjectively motivated to take the adverse action because of the protected speech.  *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008).  Such a connection can be established through indirect evidence, but inferences based

on speculation and conjecture are not reasonable.  *City of Riviera Beach v. That Certain Unnamed Gray, Two Story Vessel Approximately Fifty–Seven Feet in Length,* 649 F.3d 1259, 1271 (11th Cir. 2011) (internal quotation omitted).

Accepting the facts alleged as true, a reasonable jury could find that the City delayed BCC's sign permit applications because it did not care for BCC's message.  BCC says that the City opposes Buckhead Cityhood and that the delay it experienced is due to the City's disapproval of its speech.  The Court takes no position on the veracity of those allegations.  But they satisfy the causal connection element at the motion to dismiss stage.

### 4. Selective Enforcement

The unequal application of a facially neutral ordinance may violate the Equal Protection Clause of the Fourteenth Amendment.  *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996).  To state a claim for selective enforcement under the Equal Protection Clause, a plaintiff must plausibly allege that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff."  *Id.*  The comparator whom the defendant treated differently "must be prima facie identical in all relevant respects."  *Grider v. City of Auburn*, 618 F.3d 1240, 1264 (11th Cir. 2010); *Roma Outdoor Creations, Inc. v. City of Cumming*, 599 F. Supp.2d 1332,

41

1343 (N.D. Ga. 2009) ("[P]laintiff must demonstrate an extremely high level of similarity between the plaintiff and the allegedly similarly situated comparators").

Here, BCC bases its selective enforcement claim on the City's alleged delay in approving sign-permit applications and the issuance of notices pertaining to BCC's roof sign and parking lot.  In support of its selective enforcement claim, BCC points to two comparators whom BCC argues were not subject to the same enforcement that BCC was.  First, BCC's Amended Complaint includes a photograph of a building showing campaign signs promoting the election of Mayor Andre Dickens.  (Doc. 13-3.)  BCC contends these campaign signs are "illegal" and "almost identical" to BCC's proposed signs.  (Am. Compl. ¶ 34; Doc. 18 at 21.)  Second, BCC's Amended Complaint attaches a photograph of the building BCC now rents, taken at a time when the same building was occupied by its prior tenant—Saville Studios.  (Doc. 13-2.)  The photograph of Saville Studios shows roof and wall signs on the building in the exact locations BCC has placed its signs.  BCC alleges that the City selectively enforced its ordinances against BCC because the City did not take similar enforcement action against Mayor Dickens' campaign signs or the Saville Studios sign.

BCC's selective enforcement claim cannot succeed to the extent it is based upon the City's alleged delay in granting it sign permits. BCC does not allege that the City selectively enforced the 30-Day Policy by timely reviewing the comparators' permit applications while subjecting BCC to a delay. In fact, BCC makes no allegations about the comparators' sign-permit application processes at all. Thus, BCC's selective enforcement claim falls short as it relates to the 30-Day Policy for sign-permit applications.

BCC's selective enforcement claim fares no better when it comes to the City's roof sign and parking lot decisions made with respect to BCC, Mayor Dickens, and Saville Studios. First, the building displaying Mayor Dickens' campaign signs is not a similarly situated comparator because the Amended Complaint makes clear that the Mayor's sign is not a "roof sign" as defined by the Sign Ordinance. Specifically, the photograph of the Mayor's sign clearly shows that, unlike BCC's roof sign, it is not "placed above, supported on, or extend[ing] above the top" of the building. (Doc. 13-3); ATLANTA, GA. CODE § 16-28A.004. Neither does BCC allege that the Mayor's building had an unmarked parking lot like the one BCC had on its premises. Because Mayor Dickens' campaign signs and parking lot are not "prima facie identical" to BCC's roof sign and parking lot, they cannot be used as a comparator in BCC's selective enforcement claim.

43

Additionally, BCC has not adequately alleged that the City unequally applied its roof sign and parking lot ordinances. BCC argues that the City selectively enforced its ordinances by issuing enforcement notices to BCC for its violations but not to Saville Studios for the same violations. The problem with BCC's argument is that BCC does not allege in its Amended Complaint that the City or any city official *knew* anything about Saville Studios' alleged violations. Further, the Amended Complaint is silent on whether the Saville Studios roof sign was or was not an authorized, preexisting roof sign. BCC has not alleged that the City *selectively* enforced its ordinances because the only violations BCC alleges the City knew about were its own.

This Court confronted a similar issue in *Savage v. Hall County*, No. 2:03-cv-141-WCO, 2005 WL 8156146 (N.D. Ga. Sept. 6, 2005)—a case BCC cites to in its brief. There, plaintiffs were grading their property in violation of a county ordinance, and when the county learned of the violation, it issued a stop-work order. *Id.* at *1. When the plaintiffs defied the stop-work order, they received a citation. *Id.* The plaintiffs then brought a selective enforcement claim, alleging that other property owners engaged in similar grading activities did not receive citations. *Id.* at *2. This claim failed, however, because plaintiffs did not allege that any other property owner continued to violate the grading ordinance *after* the county learned of their

44

violation and issued a stop-work order against them.  *Id.*  Plaintiffs showed "no evidence of any uncharged property owner against whom the county had *a basis to prosecute.*"  *Id.* (emphasis added).  Similarly, in our case, BCC has not alleged that a similarly situated comparator escaped prosecution under the City's ordinances *after* the City learned of its violations.  Even taking BCC's allegations in the light most favorable to it, the Amended Complaint does not state that the City had any knowledge of the alleged violations with respect to the Saville Studios or Mayor Dickens signs.  Because BCC fails sufficiently to allege the City discriminated against it by unequally applying City ordinances, its selective enforcement claim must be **DISMISSED**.

## V.    Conclusion

Defendant City of Atlanta's Motion to Dismiss Plaintiff's Amended Complaint (Doc. 16) is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** with respect to BCC's First Amendment facial challenge (Count I); selective enforcement claim (Count III), equal protection claim (Count IV), and claim for "Injunction" (Count V).  The motion is **DENIED** with respect to BCC's First Amendment as-applied challenge (Count I) and First Amendment retaliation claim (Count II) as the retaliation claim relates to the City's alleged delay in reviewing BCC's sign-permit applications.

**SO ORDERED** this 21st day of October, 2022.

SARAH E. GERAGHTY
United States District Judge